8 327
144 594

---

## THE BEAR RIVER AND AUBURN WATER AND MINING CO. *v.* THE NEW YORK MINING CO.

The first appropriator of water for mining purposes, is entitled to have the water flow, without material interruption, in its natural channel.

He is entitled to the water so undiminished in quantity, as to leave sufficient to fill his canal or ditch, as it existed at the time of subsequent appropriations of the stream above him.

But as to the deterioration in the quality of the water, by reason of being used for mining purposes, before it reaches the ditch of the prior locator, it must be deemed *damnum absque injuria*.

Any other rule would involve an absolute prohibition of the use of all the water of a stream above any ditch supplied by it, in order to preserve the quality of a small portion taken therefrom.

APPEAL from the District Court of the Eleventh Judicial District, County of Placer.

The parties to this action, are incorporated companies for mining and other purposes. Each company is the owner of a dam and ditch, by means of which, the waters of Bear River are

diverted from the natural channel of the stream, and sold and used for mining purposes, and by defendants for the additional purpose of propelling a saw-mill. The plaintiffs were the prior appropriators of the waters of the stream, at the point where their dam, at the head of their ditch, is located. The defendant's dam and ditch were constructed subsequently to those of plaintiffs. The ditch of plaintiffs is some forty-eight miles in length, and that of defendants about twenty miles. The waters of the stream, diverted by the dam and ditch of defendants, after being used for mining and milling purposes, are returned again into Bear River, about seven miles above the head of plaintiffs' ditch, except such portion as is consumed by absorption and evaporation. The jury found, specifically, that plaintiffs, by the act of defendants, had lost twenty inches water per day, for ninety days, during the year 1855, and that the value was one dollar per inch per day. That defendants did detain the water, and cause the same to flow irregularly, and that plaintiffs were damaged by this cause seven hundred and fifty dollars; that defendants did adulterate the water, and plaintiffs sustained damage from this cause, to the amount of three thousand dollars; that defendants did not materially waste and destroy the water, but used it in a reasonable manner, and with the least injury to the plaintiffs consequent upon its use, and it could not have been used in any other reasonable manner—and that defendants are entitled to the surplus water of Bear River, to the capacity of their ditch. Upon the facts as partly admitted by the parties, and partly found by the special verdict of the jury, the plaintiffs moved the Court for judgment. This motion was overruled by the Court, and judgment given for the defendants, from which judgment the plaintiffs appealed. The suit was commenced in November, 1855, and judgment rendered in September, 1856.

*Crocker & Robinson* for Appellants.

The prior appropriators of the waters of a stream in the mineral districts of this State, acquire thereby the right to the use of the water. Irwin v. Phillips, 5 Cal. R., p. 140; Tartar v. Spring Creek Co., ib., 395; Hill v. Newman, January Term, 1856; Conger v. Weaver, October Term, 1856.

Such prior appropriator acquires a positive right to hold and enjoy the same as property, a vested right which cannot be taken away. Conger v. Weaver, 6 Cal., 548.

A subsequent locator upon a stream, whose waters have thus been taken by a prior appropriator, "has no right to complain, no right to interfere with the prior occupation of his neighbor, and must abide the disadvantage of his own selection." Irwin v. Phillips, 5 Cal., 140.

The party building a dam on a stream, appropriates all the waters above the dam. Kelly & Co. v. Natoma Co., 6 Cal.

Bear River Co. v. York Mining Co.

But the case of Hill v. King, recently decided, determines fully the very points involved in this case, and applies the principles already established, to the class of cases of which this is one.

We therefore contend that the plaintiffs, by their prior appropriation, acquired a positive vested right, to hold, enjoy, and use the waters of Bear River, without any material diminution in quantity, deterioration in quality, and unaffected in its regularity of flow, and this, whether by a person located on the stream, below or above.

1. As to the right of action for diminution in quantity:

Every man has a right to have the advantage of a flow of water in his own land, without diminution in quantity or quality. 3 Rawle, 256; 2 Cowen, 584; Angell W. C., § 95, 96, and note; 2 Eden Injunctions, 232, and note 2; 3 Kent's Com., 537.

Angell, after examining the authorities, sums up by declaring that an action will lie for any essential diminution of the water. Angell W. C., § 129; 2 Eden on Inj., 232, 1 note.

2. The right of action for deterioration in quality: Every person has a right to have the advantage of a flow of water in his own land, without alteration in quality. 3 Rawle, 256; Angell W. C., §§ 95, 96, and note; 2 Eden Inj., 232, note 2; 3 Kent's Com., 537.

Defendant threw a dead hog into a spring on his own land, and so corrupted the water which plaintiffs had used for over twenty years—held liable for the damages. 7 Munroe, 325.

A proprietor above cannot use the water so as to corrupt or impair its quality to the injury of others, as in permitting sawdust to fall into it. Lewis v. Stein, 16 Ala. Rep., 218, 219; or, in erecting a tan-yard. 3 Rawle, 256; or, in working a mine, 11 Adolph. & Ellis., 571; Angell W. C., § 136.

No proprietor has a right to use water to the prejudice of another. The true test of the principle and extent of the use of water is, whether it is to the injury of the other proprietors or not. 2 Eden Inj., 232, 1 note; 6 Porter, 472; 4 Mason, 400, 401.

3. The right of action for irregularity of flow:

Where the party above detains the water an unreasonable time, and makes it flow irregularly, an action lies. Angell W. C., § 115; 9 Cowen., 540; 3 Kent Com., 540; 17 Johnson's R. 306.

*E. D. Baker and Jo. G. Baldwin* for Respondent.

We contend:

1. That in adjusting these water-rights, we may follow, indeed, the rules of the common law; but that we cannot follow literally the application, which, under different circumstances, has been made of those rules.

We take from the common law the spirit and reason which fashioned the rule; but we cannot apply the rule with exact and unbending rigor.

The reason why a riparian owner is entitled to the flow of the water undiminished, is, because the water is a part of the inheritance; it is a part of the land; and he is as much entitled to the use of the water as to the use of the land.

But the plaintiff, while he invokes, ignores this very principle; for he claims to take all the water above and below him; to sell it as merchandise and divert it from its accustomed channels, and from the lands of the proprietors below him, or, which is the same thing, those who represent that proprietor.

The truth is, the plaintiff does not, and cannot claim under this common law right of riparian owner at all. What he claims is, not that he is owner or *quasi* owner of the soil, and, therefore, entitled to the flow of the water; but that he has made a ditch, by which he has taken to himself all the water he could catch. He claims an ownership of the water as a distinct property from the ownership of the land; the land becoming, at most, an adjunct of the water. Now, he invades the very principle he invokes for his protection, for he asserts dominion over our water, to which we have, at least, equal right. He claims it all by no better title than that he was the first to appropriate it, and this against the rights of the *supra proprietor*, and those who go in under him. He not only claims the water in his ditch, but the water in the stream which supplies his ditch. He claims a monopoly of all the water which he has sought to appropriate; and he must do this upon a principle so broad as to make a riparian right for as many miles as he chooses, and for all time, to the entire destruction of every other right, and to the impoverishment and ruin of all the country above him.

2. If we concede that the riparian right prevails, as at common law, still the plaintiff is not entitled to recover, under the modification of the common law, which the necessities of the case require. The rule of the common law, as to water, was not a rule of monopoly in its use, in favor of any proprietor, but a rule of equality as to all. No one was so to use as to materially diminish or deteriorate, but all were to use for their reasonable and necessary purposes. All might use a small stream for domestic purposes; but *sic utere tuo*, etc., applied. Now, the reasonableness of the use might be dependent on the circumstances. If a man had plenty of springs on his land he could not probably, if he kept a large washing establishment, use the water of a running stream so as to diminish the quantity necessary for the neighbors below. But if the water was of such quality as not to be fit for any but one purpose, which was irrigation, I take it that the use for this purpose being a common and necessary use to all, might be had, with reasonable limitations, by all; no man having a monopoly, and no man being shut out from his share. The rule in that case would be to allow the man above to lead off the water for irrigation and to

return it again, diminished only by the necessary use; or to use such of it as might be necessary, at such times as to allow a similar use by others. To hold otherwise would be to deny any use of the water at all in the given category.

Apply this: Here the water is only valuable for mining purposes; it is a part of the land above, and as necessary to the land above as to that below. There is the same paramount proprietor above and below. He has never relinquished his title; the tenants on the land are only tenants at sufferance; each claiming by the same tenure and to hold the property by leave or license. The water is useful to two districts of country. The ditch being a tangible thing in possession, and connected with the freehold, of course the ditch and the contents of it would be protected from any sort of invasion. But how would it be with the water above the head of the ditch? Would not the proprietor—the government—have a right to use that water if he chose, for forts, gardens, shops, anything?

Or, if the government chose to work its mines, could it not use its own water on its own land? And if so, does not the man who enters under the government, by its leave, have the same right, as against another appropriating only through the same license? What is the difference? The government, though it has given this tacit license to go on the public lands, yet has given no license to destroy any part of the inheritance; it has given no license to take from the land the water belonging to it; and could unquestionably enjoin or recover for the trespass.

The consequences of an opposite doctrine are most ruinous. It holds the right of an unlimited appropriation of water of a whole river, watering a large district of country; and the consequence of the doctrine would be, that large portions of the State would be denied the use of an element indispensable to the the prosperity of the country. It would not promote the general benefit of the country; for the diversion of water to, and its exclusive appropriation at, a particular point, would of necessity, by limiting the area of the use, restrict the benefits to a smaller number of men, and a smaller district of country. It deprives a whole region of country of water, naturally tributary to that country, in favor of a particular locality, without any showing or presumption that this locality is either of greater importance, or would be better productive of the general interest, than the allowing the use of the water in its natural and accustomed channels, or to the country of which it is naturally tributary.

It contravenes all principle; for neither by common law, nor upon reason, can it be contended that one tenant on a common estate can claim all the water, as against his co-tenant or the landlord.

It is grossly inconsistent, for it asks of the Court a right of

exclusive appropriation, and to be protected against interruption of the flow of water, when it takes up and seizes it and all, and interrupts the use above and below it.

The true principle is, as we contend, that it is a thing of compromise, and that the truth lies in the middle, between both extremes; a use above as well as below the ditch—and a use (as put to the jury) graduated by the circumstances of the case—allowing *all* the use, and none to be excluded; and if that use is necessarily of *some* injury to the other, that minor injury is to be tolerated for the sake of justice, so that one man's right shall not be taken away in favor of another man's convenience.

BURNETT, J., after stating the facts, delivered the opinion of the Court—TERRY, J., concurring.

It may be said, with truth, that the judiciary of this State, has had thrown upon it, responsibilities not incurred by the Courts of any other State in the Union. In addition to those perplexing cases that must arise, in the nature of things, and especially in putting into practical operation, a new constitution and a new code of statutes, we have had a large class of cases, unknown in the jurisprudence of our sister States. The mining interest of the State has grown up under the force of new and extraordinary circumstances, and in the absence of any specific and certain legislation to guide us. Left without any direct precedent, as well as without specific legislation, we have been compelled to apply to this anomalous state of things the analogies of the common law, and the more expanded principles of equitable justice. There being no known system existing at the beginning, parties were left without any certain guide, and for that reason, have placed themselves in such conflicting positions that it is impossible to render any decision that will not produce great injury, not only to the parties immediately connected with the suit, but to large bodies of men, who, though no formal parties to the record, must be deeply affected by the decision. No class of cases can arise more difficult of a just solution, or more distressing in practical result. And the present is one of the most difficult of that most perplexing class of cases.

The business of gold-mining was not only new to our people; and the cases arising from it, new to our Courts, and without judicial or legislative precedent, either in our own country or in that from which we have borrowed our jurisprudence; but there are intrinsic difficulties in the subject itself, that it is almost impossible to settle satisfactorily, even by the application to them of the abstract principles of justice. Yet we are compelled to decide these cases, because they must be settled in some way,

Bear River Co. v. York Mining Co.

whether we can say after it is done, that we have given a just decision or not.

The use of water for domestic purposes, and for the watering of stock, are *preferred uses*, because essential to sustain life. Other uses must be subordinate to these. In such cases, the element is entirely consumed. Next to these, may properly be placed, the use of water for irrigation in dry and arid countries. In such cases, the element is also entirely consumed. Under a proper system of irrigation, only so much water is taken from the stream as may be needed, and the whole is absorbed or evaporated. Entire absorption is the contemplated result of irrigation. When properly used, as a motive power for propelling machinery, the element is not injured, because the slight evaporation occasioned by the use is unavoidable, and is not esteemed by the law a substantial injury. Any number of riparian proprietors, can use the water as a motive power, in succession, without substantial injury to any other, for the element is just as good for the purposes of the last, as for those of the first proprietor.

Considering the different uses to which water is applied, in countries governed by the common law, it is not so difficult to understand the principles that regulate the relative rights of the different riparian proprietors. As to the preferred uses, each proprietor had the right to consume what was necessary, and after doing this, he was bound to let the remaining portion flow, without material interruption or deterioration, in the natural channel of the stream, to others below him. If the volume of water was not sufficient for all, then those highest up the stream were supplied in preference to those below. So far as the preferred uses were concerned, no one was allowed to deteriorate the *quality* of the water. And for the purposes of a motive power, there was no use of the element that could impair its quality.

But in our mineral region we have a novel use of water, that cannot be classed with the preferred uses; but still a use that deteriorates the *quality* of the element itself, when wanted a *second* time for the *same* purposes. In cases heretofore known, either the element was entirely consumed, or else its use did not impair its quality, when wanted *again* for the *same* purpose. And this fact constitutes the great difficulty in this, and other like cases. If the use of water for mining purposes did not deteriorate the quality of the element itself, then the only injury that could be complained of, would be the diminution in the *quantity*, and the interruption in the *flow*. It is this novel use of water, and its effects upon the fluid itself, that constitute the main difficulty in this case.

In repeated decisions of this Court, it has been uniformly held, that the miners were in the possession of the mineral lands un-

der a license from both the State and Federal Governments. This being conceded, the superior proprietor must have had some leading object in view, when granting this license; and that object must have been the working of these mineral lands to the best advantage. The intention was to distribute the bounty of the government among the greatest number of persons, so as most rapidly to develop the hidden resources of this region; while at the same time, the prior substantial rights of individuals should be preserved. In the working of these mines, water is an essential element; therefore that system which will make the most of its use, without violating the rights of individuals, will be most in harmony with the end contemplated by the superior proprietor.

Keeping this position in view, we will proceed to examine the questions arising in this case. It has been held by this Court, that the owners of a water-ditch were entitled to the exclusive use of the waters of the stream, as against all subsequent locators on the stream below the ditch. In the late case of Hill v. King and others, it was held, that the ditch proprietor was equally entitled to the exclusive use of the water, pure and undiminished, as well against the subsequent locator *above*, as *below*, the ditch; and that the two cases were not distinguishable in any essential particular. In that case, a petition for a re-hearing was filed, and has not yet been disposed of. The question is still, therefore, an open one.

It would certainly seem, at first view, that there could be no distinction in the two cases. But is this true? When a party constructs a ditch, and diverts the waters of a stream before the rights of others have attached below, he only takes it from one unoccupied mining locality to another. In such case, there can, as a *general rule*, be no substantial injury done to the mining interest of the State, or to the rights of individuals. The water is taken to a locality where it is used; and after being so used, it finds it way to other mining localities, where it is again used. The *effect* of the diversion is not to diminish the number of *times* the water may be used. In the majority of cases, it is used as often, and upon the whole, as profitably, as if it had never been diverted, but had continued to flow down its natural channels. The general usefulness of the element is not impaired by the diversion. It may be very safely assumed, that as much good, if not more, is accomplished by the diversion, as could have been attained, had such diversion never occurred. In fact, we must, in reason, presume that the water is taken to richer mining localities, where it is more needed, and, therefore, the diversion of the stream *promotes* this leading interest of the State. It was upon the principle, that the leading interest of the superior proprietor was attained by these diversions, that the decisons of this Court sustaining them, were predicated.

Bear River Co. v. York Mining Co.

But for the sake of the argument, we will take the position to be true, that the owner of a ditch at any point upon a stream in the mineral region, has the exclusive right, as against all subsequent locators above his ditch, to the use of the water, undiminished in quantity, unadulterated in quality, and uninterrupted in flow. We will, then, endeavor to see how such a theory will operate in practice. And before we do this, we must concede, that as a general rule, the effect of a particular construction of a statute; or the application of a certain principle, cannot be used against it, except in cases of reasonable doubt. If the meaning of the statute be clear, or the application of the principle well settled, Courts are not disposed to consider the consequences. The legislative power is responsible for them in such cases, and relief must be sought there. But in these mining cases, we are virtually projecting a new system, and if ever the practical effects of a theory could be justly considered in any case, it is apprehended it could be legitimately done in this.

It is stated by a very intelligent witness in this case, that "as rapid a stream as Bear River would carry sediment a long way;" and it may be correctly said, that about the same rapidity of current is found in all the mountain streams.

If, then, we lay down the doctrine as true, that the ditch-owner is entitled to the water in as pure a state as it was at the time he constructed his ditch, the result must be that those locating above him can never use the water at all, even in cases where the upper end of the ditch taps the stream near the point where it leaves the mineral region. For as the streams are rapid, the sediment must, in greater or less quantities, come down to his ditch. The inevitable practical result must be, that the water cannot be used so *often*, and the general usefulness of this element for mining purposes must be greatly impaired, and the leading intention of the superior proprietor be thus far defeated.

It would seem, therefore, that there is a greater difference be-the two cases than would at first appear. But this difference is greater still, when we come to consider other cases that must arise. Suppose the ditch only takes from the stream a portion of the volume, say, for example, one-tenth, the remaining portions are left to flow down the natural channel, and may or may not be used as they may or may not be needed *below*. But in such a case, what are those who afterwards locate *above*, on the same stream, to do? If they use any portion of the water, it becomes charged with sediment that must mingle the whole volume of the stream, and the water, thus deteriorated, must flow to the ditch. And if the principle is sustained that the water must flow pure to the ditch, then the nine-tenths cannot be used above the ditch for mining purposes; and because the ditch-owner has taken away a por-

tion only of the stream, must the use of the other nine-tenths be lost to all?

After the most careful and anxious consideration of this most difficult subject, the following conclusions occur to me as the nearest practicable approach to a fair and equitable adjustment of this matter:

1. The ditch-owner is entitled to have the water flow, without material interruption, in its natural channel. This right would seem to be compatible in general with the fair use of the water above.

2. He is entitled to the water, so undiminished in quantity, as to leave sufficient to fill his ditch as it existed at the time the locations were made above. This right is essential to the protection of the ditch-owner. If we lay down the rule that the subsequent locators above may so use the water as to diminish the quantity, it would be difficult to set any practical limits to such diminution, and the ditch-property might be rendered entirely worthless. As the water cannot be absorbed or evaporated but once, the ditch-owner should be entitled to its exclusive use in such a case.

3. And as to the deterioration in quality, the injury should be considered as an injury without consequent damage.

For these reasons, I think the judgment of the Court below should be reversed, and the cause remanded for further proceedings.