[S. F. No. 9737. In Bank.—March 23, 1922.]

TOWN OF ANTIOCH (a Municipal Corporation), Respondent, v. WILLIAMS IRRIGATION DISTRICT (a Corporation), et al., Appellants; W. H. METSON, as Executor, etc., et al., Interveners.

[1] WATER RIGHTS — LAND ABUTTING STREAM — NATURE OF RIGHTS. — The rights in a stream or body of water which attach to land because it abuts thereon are not of a political nature, but are private rights. They are vested exclusively and only in the owner of the abutting land and they extend only to the use of the water upon the abutting land and none other.

[2] ID.—APPROPRIATION — CODE PROVISIONS.—Where there has been actual appropriation of water, a right to it is acquired without following the course laid down in the code.

[3] ID.—PRESCRIPTION—SUBSEQUENT DIVERSION OF WATER.—One who has acquired the right to divert water from a stream by prescrip-

1. Nature of riparian rights, notes, 9 Ann. Cas. 1235; Ann. Cas. 1913E, 709; Ann. Cas. 1915C, 1026; 41 L. R. A. 744.

tion may enjoin subsequent diversions by a nonriparian owner from the stream at points above his place of diversion, whenever he can show that such subsequent diversion above will so diminish the flow of the stream that not enough water will come down to his land to supply the quantity to which he has acquired the prior right, or otherwise injure his right.

[4] ID.—NAVIGABLE WATERS — RIGHT TO SUPERVISE.—A city appropriating water from a navigable stream has no power to supervise, control, regulate, or protect the uses of the stream for navigation; only the United States or state have that right.

[5] ID.—APPROPRIATOR — RIGHT TO MAINTAIN PURITY OF STREAM.— An appropriator or diverter of the waters of a stream, as against subsequent appropriators above, has the right to have the water of the stream at his point of diversion preserved in its natural state of purity, so far as may be necessary for the purposes to which he is devoting it at the time such subsequent appropriations begin.

[6] ID.—RIGHTS OF APPROPRIATORS—ORIGIN OF—COMMON-LAW DOCTRINE. The doctrine that the rights of appropriators of water are entitled to protection as property rights is based upon the common-law rule that where the true owner does not interfere between rival claimants there can be property rights in mere possession and use, good as against everyone not in privity with the true owner, and that the prior possessor has a right to maintain his possession against all intruders not claiming under the true owners. This is the sole basis of the right of appropriation, as distinguished from the right of a riparian owner.

[7] ID.—NATURE OF APPROPRIATOR'S RIGHT — PRIORITIES — RIPARIAN RIGHTS.—An appropriator of water is, in the first instance, always a trespasser with respect to the riparian owners, and his right against a subsequent appropriator is superior solely because he is first in time and because the subsequent appropriator is also a trespasser with regard to the true owner, that is, the riparian proprietor. In the case of the state and the United States this rule is modified by the fact that they have each, as riparian owners, consented to the taking of the water.

[8] ID.—SUBSEQUENT APPROPRIATIONS — LOWERING OF STREAMS — BACKING UP OF SALT WATER FROM BAY.—An appropriator of fresh water from the Sacramento or San Joaquin River, at a point near its outlet to the sea, does not, by such appropriation, acquire the right to insist that subsequent appropriators above shall leave enough water flowing in the stream to hold the salt water of the incoming tides below his point of diversion.

APPEAL from an order of the Superior Court of Alameda County granting a temporary injunction to prevent diversion of water. A. F. St. Sure, Judge. Reversed.

The facts are stated in the opinion of the court.

Greene & Sinclair and B. D. Marx Greene for Respondent.

Mastick & Partridge and John S. Partridge for Interveners.

Goodfellow, Eells, Moore & Orrick, Thomas Rutledge, Hankins & Hankins, Bacigalupi & Elkus, Frank Freeman, Moody & Bell, Haven, Athearn, Hall & Chandler, Devlin & Devlin, Carr & Kennedy, Hiram W. Johnson, Jr., Lilienthal, McKinstry, Raymond, Haber & Firebaugh, A. A. De Ligne, W. H. Carlin, Cooley & Lachmund, Brown & Albery, Garret W. McEnerney, Elmer W. Armfield, A. E. Chandler, Stanley Moore and Andrew F. Burke for Appellants.

Purcell Rowe, F. A. Denicke, T. L. Smart, Keogh & Olds, Hadsell, Sweet & Ingalls, George Lull, Robert M. Searls and L. D. Bohnett, *Amici Curiae*.

SHAW, C. J.—This is an appeal by twenty-seven defendants in the above-entitled action from an order of the superior court made on January 7, 1921, restraining them, and each of them, during the pendency of the said action, or until the further order of the court, ''from diverting so much water from the Sacramento River and its tributaries, to nonriparian land, that the amount of water flowing past the city of Sacramento, in the county of Sacramento, state of California, shall be less than 3,500 cubic feet per second.''

The injunction was granted in pursuance of an order upon said defendants to show cause why such injunction should not be ordered. The order to show cause was issued upon the complaint in the action and upon an affidavit filed therein on behalf of plaintiff, verified by George L. La Montagne, president of its board of trustees. Antioch is a city of the sixth class. The record is exceedingly voluminous, embracing six large volumes containing 3,150 pages of typewriting. The facts which are necessary to be stated to present the questions that are decisive of the appeal may, however, be set forth in comparatively short space.

The complaint states at some length the facts that the boundaries of the city of Antioch extend to the water's edge

of the San Joaquin River and that it claims rights therein both by virtue of its riparian situation and by virtue of a diversion and appropriation of the waters of that river. Upon the hearing, however, it was conceded that the rights of the city of Antioch in said river, whatever they may be, are founded solely on its diversion and appropriation of the waters thereof to the public use of supplying itself and its inhabitants with water for domestic uses and other purposes.

The city of Antioch, continuously and under a claim of right, for more than five years before the action was begun, has been diverting from said river, at a point immediately above the city limits, and applying to said public use, a quantity of water equal to a continuous flow of a little less than one cubic foot per second. To be suitable for the main purpose to which this water is devoted, that of domestic uses, it is, of course, necessary that the water be fit for use as a beverage and for cooking and washing. It is not claimed that there is not always ample water in the river to supply the above-mentioned amount for the use of the plaintiff. The complaint made is that the diversions of water from the Sacramento River at points from ten to two hundred miles above the city of Sacramento by the appellants have caused the water of the San Joaquin River, at the city's place of diversion therefrom, to be so polluted with the salt waters of the ocean forced up the San Francisco Bay and into the lower part of the San Joaquin River by the impulses of the tides that it is unfit for domestic uses, and that thereby the rights of the city, under its diversion and appropriation, are practically destroyed.

It is necessary here to state some additional facts to explain how this pollution comes about and why diversions from the Sacramento River may or do affect the volume and quality of the water flowing down the San Joaquin River by the city of Antioch into Suisun Bay, which is the common receptacle of both rivers. The Sacramento River flows from the northerly part of the state southerly into Suisun Bay, at Collinsville. The San Joaquin River flows from the southerly part of the state and also enters said bay at Collinsville, immediately adjoining and south of the mouth of the Sacramento. Antioch is situated on the San Joaquin River about four miles above its entrance to said

bay. Suisun Bay is really the upper end of the San Francisco Bay. For many miles above the entrance of the two rivers into said bay the land between them is flat and is threaded with sloughs in which water either stands or flows. From the Sacramento River at two points, one about eight and the other about twenty-three miles above its mouth, sloughs diverge, into which parts of its waters escape and flow through the said sloughs and into the San Joaquin River at points several miles above the place of the diversion by the city of Antioch.

When the current of the water of the two rivers is sufficiently strong the influx of the incoming tides from the ocean is held back so that in times of ordinary low water in the rivers the salt water does not reach and mingle with the fresh water of the San Joaquin River at a point above its entrance into Suisun Bay. As the volume of the waters of the two rivers decrease, the point in the San Joaquin River where the salt water begins to mingle with the fresh water ascends the stream. The claim of the city is that hitherto, until the excessive diversions of the defendants, the point at which this mingling of the salt and fresh water takes place has always been far below its place of intake from the river, but that owing to the great diversion of water from the Sacramento River by the appellants during the years 1919 and 1920 the water flowing in the Sacramento River in the extreme dry season of each year was diminished so that it did not exceed at the lowest stages 420 cubic feet per second, and less of its water passed through the said sloughs into the San Joaquin River, with the result that the tides impelled salt water farther up said river and the mingling of the salt and fresh water took place at a point above the intake of the city's municipal water system, in consequence whereof the water furnished by it to its inhabitants was made salty and unfit for any use, and that in order to prevent the salt water from ascending to the said place of intake it was necessary that there be kept flowing in the Sacramento River during the dry season not less than 3,500 cubic feet of water per second at the city of Sacramento.

Before proceeding with the main point above stated, we may briefly dispose of some other questions which have been presented by the respective parties.

[1]  The fact that the city of Antioch is situated upon the San Joaquin River is wholly immaterial in the consideration of its rights in this case.  The rights in a stream or body of water which attach to land because it abuts thereon are not of a political nature, but are private rights. They are vested exclusively and only in the owner of the abutting land and they extend only to the use of the water upon the abutting land and none other.  There are cases in some of the eastern states which, upon somewhat strained reasoning, have held that a municipality whose boundaries extend to a stream of water has some rights, by reason of that situation, to apply the water of the stream to public uses within the city, rights similar in nature to that of a riparian proprietor to use the water of such stream upon his land.  We need not go into the discussion of the soundness of the reasoning of those cases.  The litigation which has arisen in this state from the doctrine of riparian rights has been of great volume and it is sufficient to warn us that we should not extend the doctrine so as to make it political and confer it upon cities abutting on a stream, but owning no land abutting thereon.  Such cases are contrary to the common-law doctrine as settled in this state whereby such rights are confined exclusively to the owner of the abutting land and are wholly of a private nature.  The status of the city of Antioch in this action, therefore, and its rights in the San Joaquin River are those of a diverter and user of the water thereof for beneficial purposes, and nothing more.  (*San Bernardino* v. *Riverside,* 186 Cal. 7 [198 Pac. 787], clauses 1, 3, 9, and 10a.)

An affidavit was filed at the hearing in the court below stating that the city owns a small tract of land bordering on the river, upon which its pumping plant is situated, and that it makes some use of the water of the river on that land for the flushing of its filters there in use as a part of its works.  But the complaint does not allege any of these facts and does not claim protection for that right.  Hence, if that is a riparian use, it is not here in issue.

[2]  The fact that the city has never posted a notice of appropriation, as provided in section 1415 of the Civil Code, is likewise immaterial.  "Where there has been actual appropriation of water, a right to it is acquired, without following the course laid down in the code.  (*DeNecochea* v.

*Curtis,* 80 Cal. 397 [20 Pac. 563, 22 Pac. 198] ; *Burrows* v. *Burrows,* 82 Cal. 564 [23 Pac. 146] ; *Wells* v. *Mantes,* 99 Cal. 583 [34 Pac. 324]''; *Watterson* v. *Saldunbehere,* 101 Cal. 112 [35 Pac. 432].) See, also, *Duckworth* v. *McKinlay,* 158 Cal. 211 [110 Pac. 927] ; *Haight* v. *Constanich,* 184 Cal. 426 [194 Pac. 28].)

[3] Appellants make the claim that the city, by its diversion and use of the water of the river, could not acquire any right thereto against other persons who afterward began to divert water at points farther up the stream. They base this claim on what they say is a ''fundamental axiom, based upon natural laws, that prescription does not run upstream.'' We know of no such rule existing anywhere and no authority is cited in support of it. To the contrary, the rule has long been settled that one who has acquired the right to divert water from a stream by prescription may enjoin the subsequent diversion of water from the stream at points above his place of diversion, whenever he can show that such subsequent diversion above will so diminish the flow of the stream that not enough water will come down to his dam to supply the quantity to which he has acquired the prior right, or otherwise injure his water right. (*McDonald* v. *Bear River etc. Co.,* 13 Cal. 220; *Phoenix Water Co.* v. *Fletcher,* 23 Cal. 481; *Natoma etc. Co.* v. *McCoy,* 23 Cal. 490; *Hill* v. *Smith,* 27 Cal. 476; *Junkans* v. *Bergin,* 67 Cal. 269 [7 Pac. 684] ; *Lower Kings etc. Co.* v. *Kings River etc. Co.,* 60 Cal. 408; *Huffner* v. *Sawday,* 153 Cal. 92 [94 Pac. 424].)

[4] We may also appropriately say that although both the San Joaquin River and the Sacramento River are navigable streams, the rights of the public have no bearing on the questions here involved. If the action of the defendants impairs the availability of the streams for navigation in any respect it is for the public authorities to maintain any appropriate action to prevent the same. The public authorities referred to are those of the United States and the state of California, respectively. The city of Antioch has no power to supervise, control, regulate, or protect the uses of the stream for navigation, and it does not claim such right or power.

[5] The law in regard to the right of an appropriator or diverter of the waters of a stream, as against subsequent

appropriators above, to have the water of the stream at his point of diversion preserved in its natural state of purity, so far as may be necessary for the purposes to which he is devoting it at the time such subsequent appropriations begin, is well established.

In Farnham on Water Rights that author says that the first appropriator of water from a stream "is entitled to have the flow of the water continue without unreasonable diminution in either quantity or quality so as to interfere with his rights" (3 Farnham on Water Rights, sec. 674, p. 2090); and "whether or not some pollution of the water of the stream will give him a right to complain will depend upon the use to which he is putting the water. If he appropriated his supply for domestic purposes, he has a right to have the quality remain such that that use may continue; and therefore the prior appropriators of the waters of a steam for domestic and culinary purposes are entitled to an injunction restraining the pollution of such waters by the operation of an ore crusher on the stream above, rendering the waters destructive to both animal and vegetable life. In any case the deterioration of the quality of the water so as to render it less fit for the use of the first appropriator gives him a right to complain." (Ibid., sec. 674a, p. 2093.) Mr. Wiel, speaking of the relative rights of prior and subsequent appropriators, says: "The prior appropriator has an exclusive right to the purity of the stream as he found it, and cannot in *any* degree be subordinated to later claimants on the ground that such subordination is necessary to allow use by the subsequent appropriator." (1 Wiel on Water Rights, sec. 524.) In this state, in one of the early decisions, it was said that in view of the importance of the rights granted by the government to all persons to extract ore from mineral lands, and of the conditions existing in the mining regions, the deterioration of the quality of the water by a later appropriator for mining purposes on the stream above "should be considered as an injury without consequent damage," when complained of by an earlier appropriator for mining purposes below, whose appropriation was said to be otherwise first in time and first in right. (*Bear River etc. Co.* v. *New York M. Co.* (1857), 8 Cal. 327, at p. 336 [68 Am. Dec. 325].) In July of the following year, in *Mokelumne etc. Co.* v. *Wood-*

*bury,* 10 Cal. 185, the same doctrine was followed. But in *Pilot etc. Co.* v. *Chapman,* 11 Cal. 162, decided in October, 1858, the court said that the Bear River case "went quite as far as it ought to have gone, when confined to the express points there announced, and we certainly feel no disposition to extend it further." (See, also, *Butte etc. Co.* v. *Vaughn,* 11 Cal. 153, 154 [70 Am. Dec. 769].) In *Phoenix Water Co.* v. *Fletcher,* 23 Cal. 486, it was held that the prior appropriator was entitled to protection against acts of subsequent appropriators which materially deteriorated the quality of the water for the uses to which he wishes to apply it, and the doctrine in the Bear River case was declared to be "clearly erroneous." The rule stated in *Phoenix W. Co.* v. *Fletcher* has been uniformly approved and followed ever since. (*Hill* v. *Smith,* 27 Cal. 482; *Hill* v. *Smith,* 32 Cal. 167; *Junkans* v. *Bergin,* 67 Cal. 269 [7 Pac. 684]; *People* v. *Elk River etc. Co.,* 107 Cal. 214 [48 Am. St. Rep. 121, 40 Pac. 486]; *Peterson* v. *Santa Rosa,* 119 Cal. 392 [51 Pac. 557].) The two cases last cited refer to the rights of riparian owners to prevent pollution. But in the first decision in *Hill* v. *Smith, supra,* the question was somewhat elaborately considered, and it was stated that the relative rights of riparian proprietors against each other in regard to the pollution of the stream by the upper proprietor and the corresponding rights of a prior appropriator against a subsequent appropriator above him on the stream were based upon the same principles. Obviously, the rule must be the same except that the rights of a riparian proprietor to the use of the water of the stream do not depend on the use which he may have previously made thereof.

At the outset of our consideration of the main point in the case, we must therefore admit that under the law of this state an appropriator of water from a stream for domestic and similar uses has the right to enjoin the pollution of the stream above him, so that the water may flow down to his place of diversion in a condition as suitable for those uses as it was in at the time he acquired his right to take it. If this were an ordinary case of pollution above, whereby the water flowing down to the lower and prior appropriator was defiled or contaminated, the rule thus fixed by our decisions, which in effect follow the common law on the subject, would govern the case and the plaintiff would

clearly be entitled to the injunction granted, or to some restraint that would have the effect of preserving the water in its original purity.

But, in its origin and cause, the case at bar is wholly unlike the cases by which the rule just stated was established. Nothing has been placed in the stream above by the defendants that in the least affects the purity of the water flowing therein. All that they have done is to deplete the stream by taking out water for irrigation, and they have done this under provisions of the Civil Code which give them the right to take it from the stream for beneficial uses, subject to the lawful rights of prior appropriators below and to the rights of riparian proprietors. The pollution of the water complained of is caused by the fact that the depleted volume of the stream does not hold back the rising tide of salt water from the bay below as effectually as the natural volume might do. The case is unprecedented in character. Neither the effects of the application of the rule aforesaid to such a case, nor the conditions here existing, have ever been considered in any decision on the subject. The question is open for the adoption of such rule as we may deem just.

The place where the river water meets and overcomes the inflowing tide is not fixed. It changes with the rise and fall of the rivers and tides. The tides vary in height. The rivers vary much more in their volume and height. Hence, it follows that where there is fresh water one day there may be salt water a week, or even a day, thereafter. At a point near to that meeting place, the diversions of the riparian owners, of which no complaint is here made, may change the character of the water at any time. Dry seasons advance the point of meeting farther up the stream, and wet seasons drive it farther into the bay. Any person who appropriates water from one of these rivers at a point near to that meeting of the waters must take notice of these conditions and his rights will necessarily be restricted thereby. He acts at his peril with regard to them. He must also take notice of the policy of our law, which undoubtedly favors in every possible manner the use of the waters of the streams for the purpose of irrigating the lands of the state to render them fertile and productive, and

discourages and forbids every kind of unnecessary waste thereof.

The record in this case shows that in the extreme dry season in the year 1920 the flow of the river at the city of Sacramento was reduced to 420 second-feet, largely by the diversions of the defendants. The claim of the city of Antioch is that for its protection the flow at that point must be maintained at 3,500 second-feet. In effect, therefore, its claim is that 3,080 second-feet of water otherwise available for irrigation above must at all times be kept flowing down the river into the bay, without any other beneficial use whatever, in order that the city of Antioch may be able to take less than one second-foot of fresh water therefrom at its pumping plant near the mouth of one of the rivers. Not only this, but, if its claim is allowed, every other prior user of water who takes it out near to the meeting place of the waters must be allowed the same right. And as the close proximity of the place of diversion to the meeting of the waters would not divest or affect the right as against subsequent appropriators above, one whose pump was a hundred yards above the highest known rise of the salt water would have the right to keep practically the entire river flowing down to his pump so as to keep the salt water therefrom. Thus a single appropriator of water for the domestic use of one family, taking probably less than a fiftieth part of a second-foot of fresh water for actual use, would, in practical results, appropriate or control 3,080 second-feet of water of the river to supply his pipe with that infinitesimal quantity, and in that way he would keep more than 300,000 acres of fertile land in the valley above dry and unproductive. By a valid appropriation of one miner's inch he would, in effect, appropriate all the water flowing in both of these large rivers. It would be hard to conceive of a greater waste for so small a benefit. It may without exaggeration be said that the full use of the waters of the rivers and mountain streams for irrigation, power, and like beneficial purposes, is absolutely necessary to the continued growth and prosperity of the state. The interior valleys are rapidly growing in population and their capacity for production is being developed, chiefly, by irrigation of the land. The necessity for the most economical and careful use of the limited supply of water obtainable in

this arid climate has often been adverted to in the decisions of this court from the beginning of its settlement by white men, and as it grows and increases in population and production the necessity increases correspondingly. Nevertheless, the plaintiff contends that under the principles of the common law bearing upon the subject of water rights by appropriation, as established in this state, the city of Antioch, as a prior appropriator from the stream, has the right to enjoin a pollution of the water thereof, artificially produced after its use thereof began, from any causes whatever, even under the circumstances above detailed, except where it is caused by the exercise of riparian rights.

In this state the climate, the original ownership of the land, the policy of the governments of the United States and the state, the original owners, regarding the use and occupancy thereof for mining purposes by persons not in privity with them, and the necessity of water for placer mining and irrigation, are all so different from the conditions existing in Great Britain, where the common law had its origin, that the court from the first has had some difficulty in applying it here without producing the injustice or wrong which it is the chief purpose of the common law to prevent or redress. It has frequently been necessary to invoke the maxim of jurisprudence that "where the reason of a rule ceases, so should the rule itself," and this maxim has been incorporated into the Civil Code. (Sec. 3510.) It is as much a part of the common law as are the rules concerning the right of appropriation of water. In the early history of our jurisprudence there was much doubt whether there were any principles of the common law whereby the relative rights of individuals who took water from the streams for the purpose of mining and who took up mining claims whereon to use the water and extract gold thereby were to be defined and controlled. The early decisions display some confusion and conflict of ideas on the subject. It was doubted whether the law of riparian rights could be applied, since the use was generally on land not riparian, and it was finally held, as above shown, that the rules as to riparian rights, modified to suit the new conditions, could be resorted to for a guide in determining such relative rights. (*Hill* v. *Smith*, 27 Cal. 482.) There was dispute on the question whether the so-called rights of appropriators

of water who took it without express leave of the paramount owner, or the rights of the miners to their mining claims, taken and held by mere prior occupancy, constituted property which the prior appropriator or occupant was entitled to call upon the courts to protect. [6] It was not until a number of years after the settlement of the state that the courts placed the doctrine that such rights were entitled to protection as property rights upon the true basis, that is to say, upon the doctrine of the common law that where the true owner did not interfere between rival claimants there could be property rights in mere possession and use, good against everyone not in privity with the true owner, and that the prior possessor had a right to maintain his possession against all intruders not claiming under the true owners. This is the sole basis of the right of appropriation, as distinguished from the right of a riparian owner. [7] He is, in the first instance, always a trespasser with respect to the riparian owners, and his right against a subsequent appropriator is superior solely because he is first in time and because the subsequent appropriator is also a trespasser with regard to the true owner, that is, the riparian proprietor. In the case of the state and the United States this rule is modified by the fact that they have each, as riparian owners, consented to the taking of the water. (*Palmer* v. *Railroad Commission,* 167 Cal. 168–173 [138 Pac. 997].) The law of the rights of appropriators of water in this state, especially those who, like the city of Antioch, do not appropriate water under the Civil Code rules, is, therefore, the creation of the courts in the endeavor to adapt and modify the rules of the common law so as to suit the peculiar conditions existing here. The question remains whether, in view of the unprecedented conditions of the case at bar, the rules applying to the ordinary pollution of water by the deposit of deleterious matter in the stream above the injured party are to be applied here.

Such questions do not often arise and the doctrine above adverted to should, of course, always be applied with caution. Similar unprecedented conditions were presented in *Katz* v. *Walkinshaw,* 141 Cal. 116 [99 Am. St. Rep. 35, 64 L. R. A. 236, 70 Pac. 663, 74 Pac. 766], and the numerous cases following it. It was there said that "whenever it is found, that, owing to the physical features and character

of this state, and the peculiarities of its climate, soil, and productions, the application of a given common-law rule by our courts tends constantly to cause injustice and wrong, rather than the administration of justice and right, then the fundamental principles of right and justice on which that law is founded, and which its administration is intended to promote, require that a different rule should be adopted.'' That case involved conditions prevalent over a large portion of the state not interested in the property rights there determined. This case presents perhaps the only instance in the state where the question at issue has arisen or can arise. The rule we may adopt here can scarcely be a precedent for any case except one arising upon these two rivers concerning a similar claim of some prior appropriator near the outlets thereof.

In addition to the facts and conditions already mentioned there are others to be considered which make the practical application of the rule contended for by the plaintiff still more difficult and uncertain. The year 1920 was one of the driest that has occurred in the history of the state. In an average season the plaintiff would have suffered no injury from the diversions complained of. The Sacramento and San Joaquin Rivers are by far the largest in the state. They each traverse wide valleys in which are many hundreds of thousands of acres of land suitable for irrigation and comparatively barren without it. They are each fed by large tributaries heading high up in the mountains. In these tributaries and in the main streams many appropriations of water for irrigation have already been made and in the tributaries of the Sacramento River there are possibilities of many more, particularly if storage reservoirs are resorted to. It is certain that such appropriations and uses of the waters of those streams will be made or attempted in the future. If this rule should be adopted, it is obvious that no one could safely attempt such enterprises, or invest money therein, without previously ascertaining whether there are any appropriators of fresh water from the river near to its outlet into the bay, a hundred or more miles below, who might be affected injuriously thereby, and thereupon coming to terms with all such appropriators concerning the resulting damage to be claimed and paid. There would be great difficulty in ascertaining the facts, and still

greater in coming to an agreement. A private appropriator could not condemn the right and must agree or act at his peril. A public enterprise must needs agree or enter into a costly litigation to condemn the right. The damage from any particular diversion or storage out of so many could not be ascertained with any degree of even approximate accuracy. The result, in actual practice, would be either that the appropriators near the outlet would have to abandon all claims of damage, or the proposed diversion or storage enterprises must be abandoned. Antioch carries its water from its pump to its reservoir by a six-inch pipe. By moving its pump a few miles up the river it could obtain water free from saline solution. It is not altogether improbable that if it had devoted the same amount of energy and expenditure to a change of its place of diversion as it has to the present litigation, it would have had the water uncontaminated by salt with less delay than had already occurred and at no more expense. And from the large number of attorneys who have appeared for the numerous defendants and the time they have expended in the case up to date, it is also possible that if they had acted in concert to make the change of place for the plaintiff some expense might have been saved and the litigation avoided entirely. It is evident from all these considerations that to allow an appropriator of fresh water near the outlet of these two rivers to stop diversions above so as to maintain sufficient volume in the stream to hold the tide water below his place of diversion and secure him fresh water from the stream at that point, under the circumstances existing in this state, would be extremely unreasonable and unjust to the inhabitants of the valleys above and highly detrimental to the public interests besides.

[8] Our conclusion is that an appropriator of fresh water from one of these streams at a point near its outlet to the sea does not, by such appropriation, acquire the right to insist that subsequent appropriators above shall leave enough water flowing in the stream to hold the salt water of the incoming tides below his point of diversion. Further than this we need not go.

The respondent cites the decisions of the courts of Texas in *Bigham Bros.* v. *Port Arthur Channel & Dock Co.*, 100 Tex. 192 [13 L. R. A. (N. S.) 656, 97 S. W. 686], and

188 Cal.—30

*Houston Transp. Co.* v. *San Jacinto Rice Co.* (Tex. Civ. App.), 163 S. W. 1023. It is claimed that they lay down a rule contrary to the conclusion above stated. In the Bigham case the plaintiffs owned land on Taylor Slough, twenty miles above its mouth. It is a fresh-water stream flowing into Sabine Lake. Sabine Lake also receives the waters of the Nechez River and the Sabine River, and these streams keep its waters fresh. The lake is connected with the Gulf of Mexico by a channel known as Sabine Pass. Taylor's Bayou empties into Sabine Lake several miles above the point where the pass debouches therefrom. Under natural conditions the salt water from the gulf flowing up the pass during the rising tides caused fresh water of the lake to rise and flow up Taylor's Bayou, and carried no salt water up the bayou, or, at all events, not as far as the plaintiffs' farm. The defendant desired to establish docks and wharves in a place free from winds and waves, and for that purpose it constructed a canal nine miles long from a point on the pass across the intervening land to a point on the bayou 2,000 feet above its entrance into the lake. The effect was that the salt waters of the gulf, when raised by the tides, flowed directly from the pass into the canal and thence into the bayou in such quantity and with such force that they were carried to plaintiffs' land, and the water thereof at that point was thereby made unfit for plaintiffs' use for the irrigation of their riparian land. The court in effect held that this was an unlawful alteration of natural conditions, sufficient to constitute a nuisance to plaintiffs and a taking of their property for public use without compensation, contrary to the Texas constitution. In the other case the defendant had begun the removal of a sand-bar which had naturally formed in the gulf across and in front of the mouth of the San Jacinto River in such a manner that it prevented the tides from flowing directly into and up the river with enough force to reach the plaintiff's land, which abutted on the river six miles above its mouth. The removal of the bar would remove this obstruction to the flow of salt water and would cause such water to pass up the stream to and beyond the land of plaintiff, to the damage of plaintiff's rights as a riparian owner on the stream. It was held that this also was an unlawful and actionable injury.

It is clear from this statement that the facts of these cases were not the same as those controlling the present case. The opinions show that the reasons we have discussed were not suggested to or considered by the Texas courts. The facts there considered were not essentially different from any other unlawful interference with natural conditions in such a manner as to directly affect and damage the property of another, in which case the right of action of the injured party is well settled everywhere. The conditions of the case before us, as we have endeavored to show, are of a character so peculiar, extraordinary, and unprecedented that the reasons upon which interferences with natural conditions to the injury of another are held to be unlawful are not applicable, and the damage therefrom, if any there be, does not constitute an actionable injury.

In the argument there is considerable discussion in regard to the supposed effect of the doctrine we have laid down upon the lands along and near the sloughs and river channels of the delta lands above the mouths of the two rivers. There were no allegations in the complaint concerning these lands. No owner of such land, by intervention or otherwise, sought relief at the hand of the court below, and that court, so far as appears, did not consider the effect on such land. It did not find any facts relating thereto, the pleadings alleged no facts bearing thereon, and none are presented in the record for our consideration. There is, therefore, nothing for this court to say on the subject. We know of nothing relating to such lands that would require a conclusion different from that which we have stated.

A good deal is said in the briefs by the respondent to the effect that the water diverted by the defendants is all used for the cultivation of rice and that rice-growing requires such an excessive quantity of water, as compared with any other crop, that it practically amounts to a waste, and that its cultivation ought not to be tolerated in California, where water for other crops and uses is so indispensable and so scarce. Rice is not grown by irrigation, in the ordinary sense of that word, but by flooding. The ground must be kept covered with water so that for weeks at a time the rice-fields, in this case, embracing over 300,000 acres, it is claimed, present the appearance of a large lake. In some instances and in some soils the grow-

ing of rice, so it is said, requires nine times as much water as ordinary crops. It may be that under these circumstances rice culture in this state should not be encouraged, or that, in the exercise of the police power, the use of the waters of the state in that business might be lawfully forbidden. But that is a legislative question which the court cannot consider. The making of such a rule is beyond our power. The rule here declared is and must be general in its application, and it protects all other beneficial uses of water on land in the Sacramento and San Joaquin Valleys as well as that of the rice-growers.

The order appealed from is reversed.

Lawlor, J., Wilbur, J., Waste, J., Shurtleff, J., Sloane, J., and Lennon, J., concurred.