[Civ. No. 32099. First Dist., Div. Four. Mar. 14, 1974.]

NILES SAND AND GRAVEL COMPANY, INC., et al., Plaintiffs and Appellants, v.
ALAMEDA COUNTY WATER DISTRICT, Defendant and Respondent.

ALAMEDA COUNTY WATER DISTRICT, Plaintiff,
Cross-defendant and Respondent v.
NILES SAND AND GRAVEL COMPANY, INC., et al., Defendants,
Cross-complainants and Appellants.

Peter V. Brucher, Kenneth D. Robin, Fadem, Kanner, Berger & Stocker and Gideon Kanner for Plaintiffs and Appellants and for Defendants, Cross-complainants and Appellants.

Rogers, Vizzard & Tallett, Berry, Davis & McInerney and John D. Rogers for Defendant and Respondent and for Plaintiff, Cross-defendant and Respondent.

## OPINION

**RATTIGAN, Acting P. J.**—As will appear in further detail, the appeals herein present the following factual situation: Respondent Alameda County Water District maintains a program through which it regularly replenishes the natural underground water supply within its territorial jurisdiction by forcing stored water below ground in a process of percolation. Appellants are the operators of deep "pits" (or "quarries") from which they extract and sell commercial sand and gravel. The district's replenishment program raised the underground water table to a level below which appellants' pits had been excavated, thereby causing or contributing to flooding in the pits and the interruption of appellants' business. Appellants pumped out and discharged the water, causing substantial quantities of it to run off into San Francisco Bay and to be lost.

Appellants commenced an action against the district (Alameda County Superior Court No. 401131) in which they sought damages upon the basis that the flooding of their pits constituted a "taking" or "damaging" of their property, by the district and for a public use, which was compensable by way of inverse condemnation under article I, section 14 of the California Constitution.[1] In another action subsequently commenced against appellants in the same court (No. 403003), the district sought to enjoin them from discharging and wasting its water and to recover damages from them for the loss of water previously wasted. In a counterclaim and cross-complaint filed in action No. 403003, appellants again claimed the right to recover damages by way of inverse condemnation.

---

[1] As pertinent, article I, section 14 provides: "Private property shall not be taken or damaged for public use without just compensation having been made to . . . the owner . . ." (As to the well-settled concept of inverse condemnation, under this constitutional provision as "self-executing," see, e.g., *Rose* v. *State of California* (1942) 19 Cal.2d 713, 717-725 [123 P.2d 505]; 3 Witkin, Summary of Cal. Law (7th ed. 1960) Constitutional Law, §§ 209, p. 2021, 223, p. 2033.)

The trial court ordered the two actions consolidated for purposes of trial and bifurcated the trial as between the issues of liability and damages. After a nonjury trial of the liability phase of the actions as consolidated, the court found in favor of respondent district and entered a judgment which (1) enjoined appellants from discharging water from their pits without the written consent of the district or the further order of the court; (2) reserved jurisdiction to determine the amount of damages, if any, incurred by the district for waste by reason of the loss of water previously discharged from the pits; and (3) denied inverse condemnation relief to appellants as sought in their complaint in action No. 401131 and in their counterclaim and cross-complaint in action No. 403003.

The appeals are from the judgment and from an order which (as will appear) was collateral and incidental thereto. The principal question presented is whether the flooding of appellants' pits constituted a "taking" of their property which is constitutionally compensable under the concept of inverse condemnation. (See fn. 1 and accompanying text, *ante.*)

### Facts

Although the record on appeal is lengthy and intricate, the material facts are relatively simple and are not disputed. The record of the single trial supports the following recital thereof:

Appellant Inland Aggregates Company (a corporation) is the lessee, and appellant Niles Sand & Gravel Co., Inc. (a corporation) is its sublessee,[2] of certain land located in the City of Fremont in Alameda County. At all pertinent times since 1951 or 1952, appellants had been engaged in the business of "harvesting" (i.e., extracting), processing and selling commercial sand and gravel from deep pits excavated by them on the property mentioned. At all such times, their operations were conducted subject to land use permits issued by the County of Alameda at first and, later, by the City of Fremont.[3]

---

[2] The facts here recited are as alleged in appellants' complaint in action No. 401131 and their cross-complaint in action No 403003. The trial court found that appellants were "owner[ ]" thereof. The distinction is not significant for purposes of the present appeals; we may presume that appellants held the subterranean rights in the property ordinarily held by an owner in fee.

[3] During the events here involved, appellants' operations were conducted under a conditional use permit issued by the City of Fremont, in 1968, pursuant to pertinent sections of its municipal code. According to the evidence (and to an unchallenged statement in respondent district's brief), the permit was revocable by the city. Two of the numerous conditions of the permit, which was received in evidence at the trial hereof, required the express approval of respondent district prior to appellants' "modification of ground slopes" in their sand and gravel pits or the filling of excavated

Respondent is a county water district organized pursuant to the County Water District Law (present div. 12 of the Wat. Code [commencing with § 30000].) It was formed in 1914 for the principal purposes of conserving the ground water supply in the Niles Cone Ground Water Basin (hereinafter "the Niles Basin," or "the basin") and protecting it against saline intrusion from San Francisco Bay. In addition to the powers and duties vested in it by the County Water District Law, the district has certain additional powers and duties by virtue of an uncodified 1961 enactment which affected the district alone and which pertain to "replenishment of ground waters." (Stats. 1961, ch. 1942, § 1 et seq., p. 4092 et seq.)[4]

The Niles Basin is an underground water basin which was geologically formed, over thousands of years, by the deposit of sand, gravel and other alluvial materials from the flow of Alameda Creek. The lateral dimensions of the basin approximately correspond with the territorial surface boundaries of respondent district as fixed by law. Since 1935, the district has been engaged in the continuous water replenishment (or "recharge") program within the basin, whereby it collects water on the land surface and stores it in sufficient quantity so that the pressure of its weight and density forces

areas; another required them to comply with the district's storm drainage requirements.

Another condition (hereinafter "Condition No. 22") expressly provided that appellants *"shall cooperate with the Alameda County Water District* [respondent] *to the end that water pumped in connection with . . .* [their] *. . . operations shall not be wasted to San Francisco Bay nor shall ground water percolation capacity be diminished in quality or quantity."* (Italics added.)

The evidence herein also shows the following: In 1969, appellants formally applied to the Fremont City Council for modification or deletion of Condition No. 22 by reason of "the apparent impracticability and inequity of said condition if interpreted to prohibit pumping of water of [*sic*] the quarry pits." After a detailed review of Condition No. 22 and of appellants' current operations (including the facts later shown in evidence herein), the council adopted, by resolution, "Findings and Conclusions" in which it denied modification or deletion of the condition as sought. The council expressly determined that "[t]he degree of cooperation required pursuant to Condition No. 22 by . . . [appellants] . . . is that there not be a 'substantial wastage' of water as a result of quarry operations," that appellants had demonstrated "inadequate cooperation," and that they had violated Condition No. 22, by causing wastage of water to San Francisco Bay during a designated period in 1969. The council's resolution apparently motivated appellants in commencing their action against the district (No. 401131) thereafter.

[4]The 1961 enactment is entitled as follows: "An act providing additional powers and duties for the Alameda County Water District (organized pursuant to the County Water District Law, commencing with Section 30000 of the Water Code), relating to the replenishment of ground waters." (Stats. 1961, ch. 1942, p. 4092.)

it to percolate through the underlying soil and into the basin proper.[5] This process inevitably results in raising the underground water table.

Appellants' sand and gravel pits, which overlie the Niles Basin on the surface, are located within the territorial boundaries of the district and in the "major recharge area" of the water replenishment program described above. The surface elevation in the area of the pits is approximately 60 feet above sea level. In 1969, some of the pits had been excavated to depths which were as much as 120-125 feet below ground level and 60-65 feet below sea level. The elevation of the underground water table in the area, in a "state of nature" (i.e., in "that condition which would have existed without diversion from the watershed and/or extractions from the basin"),[6] was at least 20 feet above sea level (i.e., as much as 80-85 feet above the maximum depth to which appellants had excavated). Because appellants consequently expected to encounter water below ground (as they inevitably did), they installed facilities with which they pumped water from their pits, causing it to run off to San Francisco Bay through the channel of Alameda Creek. During the period of approximately three years which preceded the trial, the water wasted by reason of this pumping operation amounted to several billion gallons; at the time of trial, the rate of wastage was five million gallons per day. The latter amount would meet the average daily water needs of a city of 30,000 people. During the period mentioned, the situation had thus reached the point where the district and appellants were working at complete cross-purposes: as the district was replenishing the water in the Niles Basin, appellants were draining it.

These events resulted in the actions between the parties as described above.[7] At the single trial of the liability phase thereof (also as described above, and in addition to the evidence previously summarized), the trial

---

[5]It is undisputed that the district conducted its water replenishment program pursuant to, and within, the authority vested in it by statute. (See the County Water District Law [Wat. Code, div. 12 (commencing with § 30000)] and the 1961 enactment cited at fn. 4, *ante*.) It is also undisputed that the district owns the ground water in the Niles Basin as trustee for all the overlying surface owners located within its boundaries.

[6]The definition of a "state of nature," here recited, was adopted by the parties in various documents received in evidence at the trial.

[7]A third action (No. 400155) had been commenced by the district, seeking similar injunctive relief and damages from other entities (collectively called "Jamieson" herein) who were quarry operators engaged in activities similar to appellants' in pits nearby. The Jamieson action was consolidated and tried (as to the liability phase) with the two actions involving the district and appellants. After the trial court had filed its "Memorandum Decision" and had filed findings of fact and conclusions of law in the three consolidated actions (as hereinafter recited), Jamieson and the district stipulated to a judgment in the district's favor in the Jamieson action. Consequently, neither the action nor Jamieson is involved on the present appeals.

court heard evidence to the general effect that the public's water needs were critical throughout California and within the territorial boundaries of respondent district. Evidence was also introduced concerning the necessity and character of underground water replenishment programs and, specifically, the one conducted by the district. For example, Harvey Banks (who was called as an expert by the district and whose qualifications as such were, and are, unchallenged) testified that such programs are conducted "primarily because of the absolute imperative necessity to make the maximum conservation of local run-off in the various streams, plus the necessity of providing for regulation of water supplies provided by . . . [various public water projects] . . . [T]he necessity of doing this is in part due to the fact that our surface [water] storage capacity in this State is nearly exhausted, particularly in the Central Valley, here in the [San Francisco] Bay Area, in the San Joaquin Valley, and Southern California. A few remaining sites are very difficult to build upon and they are extremely expensive, so it becomes imperative to utilize the underground resources to the maximum feasible extent in order to both conserve water and to conserve costs."

In the testimony of Banks and other witnesses, it was also shown as follows: Adequate fresh water replenishment is essential to prevent salt water intrusion in the Niles Basin because of its immediate proximity to San Francisco Bay. Since 1935, respondent district has sought to maximize the quantity and supply of water within the basin, and to preserve the quality of water within it, by maintaining the "bayward gradient" and thereby minimizing salt water intrusion.

In order to carry out its mandate under the County Water District Law, and the 1961 law affecting it (see text at fn. 4, *ante*), the district has contributed to the enactment of legislation enabling it to satisfy its needs for supplemental water to meet the demands in the basin; has acquired percolation pits for purposes of replenishing the underground supply of water within its geographical area; has obtained from the State of California valid water rights to divert water from Alameda Creek and place it in underground storage for later beneficial use; and has replenished the water supply in the Niles Basin by capturing and holding other water for the same use. Banks further testified that the district's replenishment program has prevented the Niles Basin from being lost to salt water intrusion and that, if such loss had occurred, appellants' sand and gravel pits would presently be standing in salt water.

The consolidated cause having been submitted for decision on the liability phase at the conclusion of the trial thereof, the trial court entered a

"Judgment of Injunction" on June 1, 1971, which enjoined appellants and Jamieson (see fn. 7, *ante*) from discharging water from their pits without the written consent of the district or "further order of this court." On October 15, 1971, the court signed a "Memorandum Decision," spelling out the substance of its prospective decision in favor of the district and against appellants and Jamieson. On November 15, 1971, appellants noticed a motion for an order dissolving or modifying the "Judgment of Injunction" entered on June 1, 1971. On January 7, 1972, the trial court entered an order denying this motion.

Later in January, 1972, the court filed a single set of findings of fact and conclusions of law, in favor of the district, under the caption of all three actions. (See fn. 7, *ante*.) Among other findings of the pertinent facts as summarized above, the court specifically found that the natural ground water elevation of the Niles Basin was at least 20 feet above sea level, that the district's water replenishment program in the basin served a beneficial public purpose, and that appellants' discharge of water from their pits was detrimental to the program and the basin alike.[8]

Among its "Conclusions of Law," the trial court stated: "I. That the property of . . . [appellants] . . . overlying the Niles Cone Ground Water Basin is *subject to a public servitude* for water and water conservation purposes. II. That the ground water elevation of said *public servitude* in the major recharge area of . . . [the basin] . . . is elevation 20-feet [*sic*] above sea level. III. That all water within said *public servitude,* whether present in said basin by replenishment or otherwise, is subject to the control of . . . [the district]. . . . IV. That . . . [appellants have] . . . *property rights in the water within the public servitude of said basin only to a correlative and reasonably beneficial use thereof as overlying*

---

[8]These findings were stated as follows:

"V. That the ground water elevation of the underground basin or reservoir in the major recharge area *in a state of nature* was established . . . as a level of more than 20 feet above sea level.

" . . . . . . . . . . . . . . . .

"VII. That since its formation in 1914, the district has continuously extended its efforts to replenish the basin and replace the overdraught on the original water supply, said overdraught being the effect of the domestic, commercial, and agricultural users of water which the advent of increased population had *on the state of nature.*

"VIII. That the replenishment activity on the part of the district to offset the overdraught is for a *beneficial public purpose.*

" . . . . . . . . . . . . . . . .

"XIV. That . . . [appellants] . . . , to offset the intrusion of water into the quarry pits, pumped water from them and this water was discharged in such a way as to permit it to run off into San Francisco Bay in substantial quantities, *to the general detriment of the water basin and the restorative program of the . . . district.*" (Italics added.)

*owners.* V. That . . . [appellants have] . . . not established the existence of a property interest affected by any of the activities of the district. VI. That the pumping and discharging of water from the gravel pits beginning in 1968 by . . . [appellants] . . . constituted a non-beneficial use of said water. . . ." (Italics added.)

Pursuant to these findings and conclusions, the trial court entered the aforementioned judgment against appellants on March 7, 1972. As indicated above, but more specifically summarized here, the judgment (1) enjoined appellants from discharging water from their sand and gravel pits without the written consent of the district, and from doing so, in such manner as to cause discharged water to run off into San Francisco Bay "without the further written consent of . . . [the district] . . . or further order of this court"; (2) reserved jurisdiction in action No. 403003, to determine the amount of damages, if any, incurred by the district for the "nonbeneficial use and wastage of water" previously pumped from appellants' pits; and (3) denied inverse condemnation relief to appellants as sought in their complaint in action No. 401131 and in their cross-complaint in action No. 403003.

The three appeals before us are (1) from the just-mentioned judgment as entered in action No. 401131, (2) from the same judgment as entered in action No. 403003, and (3) from the trial court's order of January 7, 1972, denying appellants' motion for dissolution or modification of the "Judgment of Injunction" entered on June 1, 1971. Among the three notices of appeal indicated, two are addressed to the same judgment. The order of January 7, 1972 (to which the third notice is directed), pertained to an injunction which was interlocutory in nature and which was essentially merged into the main judgment. Accordingly, the matters presented on all three appeals may be considered on the one taken from the main judgment alone. For the reasons next stated, appellants' contention on that appeal cannot be sustained; we affirm the judgment and the order mentioned.

### The Trial Court Correctly Applied the "Correlative Rights Doctrine" in the Case

 Appellants challenge the judgment upon the ground that it denies them relief in inverse condemnation as assertedly guaranteed them by article I, section 14, of the California Constitution. (See fn. 1, *ante.*) Their constitutional claim rests upon the arguments that they have the absolute right to use their land, to unlimited depths below its surface, because Civil Code section 829 vests in them "the right to the surface and to everything

permanently situated beneath . . . it";[9] and that the flooding of their pits below ground level, as a result of the district's water replenishment program, has interfered with their subterranean rights in their land, and with their sand and gravel business, so as to constitute a "taking" or "damaging" of their property which is for a public use and for which article I, section 14, therefore entitles them to compensation.

Appellants address this argument, to the judgment itself, in terms of the trial court's conclusions of law in which it declared that their land was subject to a "public servitude for water and water conservations purposes" up to a designated elevation in the subterrain of the Niles Basin. (Conclusions of law I and II, quoted *supra.*) According to the argument, the judgment which followed has the unconstitutional effect of denying appellants the compensation guaranteed them by article I, section 14, because the trial court therein contrived to "create a new property interest for the benefit of a public agency, label it a 'servitude,' and thereby allow that agency to escape liability to the landowner for damages in inverse condemnation."

The trial court did not do these things. Among its conclusions of law mentioning the "public servitude" in the Niles Basin, the court further declared that appellants have "property rights in the water *within the public servitude of said basin only to a correlative and reasonably beneficial use thereof as overlying owners.*" (Conclusion of law No. IV, quoted *supra* [italics added].) Read together, the conclusions unmistakably express the court's application of the so-called "correlative rights doctrine"[10] which pertains, not to surface owners' use of their *lands* within an underground water basin, but to their use and disposition of *water* percolating within it.

The correlative rights doctrine was first pronounced in a landmark case (*Katz* v. *Walkinshaw* (1903) 141 Cal. 116 [74 P. 766]) in which the Supreme Court, in a decision upon rehearing (see *id.* at p. 120), developed and reiterated the doctrine as adopted in its original decision. (*Id.* at pp. 137-138 et seq.) Under the facts presented in *Katz*, the court was called upon to balance the effect of the common law maxim "Cujus est

---

[9]Civil Code section 829 provides in full that "The owner of land in fee has the right to the surface and to everything permanently situated beneath or above it."

As previously indicated, it may be presumed that appellants' underground rights in their *land* are those of an owner in fee. (See fn. 2, *ante.*)

[10]In its "Memorandum Decision" signed on October 15, 1971, the trial court further indicated that it was resolving the case by applying the doctrine mentioned. We have resorted to the memorandum, as we may do, "for the purpose of discovering the process by which . . . [the trial judge] . . . arrived at his conclusion." (*Henderson* v. *Fisher* (1965) 236 Cal.App.2d 468, 472 [46 Cal.Rptr. 173]. Cf. 6 Witkin, Cal. Procedure (2d ed. 1971) Appeal, § 230, pp. 4220-4221.)

solum, ejus est usque ad inferos,"[11] as to waters percolating below ground, against the realities of the underground water situation in California. (*Id.* at pp. 120-121, 125-128, 139.) Rejecting the maxim under compulsion of the realities (see *id.* at p. 143; see also Krieger & Banks, *Ground Water Basin Management* (1962) 50 Cal.L.Rev. 56, 72-73) the court held that, as between the owners of land overlying strata of percolating waters, the rights of each to the water are limited, in correlation with those of others, to his "reasonable use" thereof when the water is insufficient to meet the needs of all. (*Id.* at pp. 135-136, 137, 143-144; *City of Pasadena* v. *City of Alhambra* (1949) 33 Cal.2d 908, 926 [207 P.2d 17]; *California Water Service Co.* v. *Edward Sidebotham & Son* (1964) 224 Cal.App.2d 715, 725 [37 Cal.Rptr. 1]; 3 Witkin, Summary of Cal. Law (8th ed. 1973) Real Property, § 595 [Correlative Rights Doctrine], pp. 2258-2259.)

By reason of the authorities just cited, the trial court correctly applied the correlative rights doctrine in principle. Once it had been shown to apply, the questions became factual. Resolving the first one, the court found that the elevation at which the doctrine applied in the "major recharge area" of the Niles Basin was 20 feet above sea level. (See finding No. V, quoted in fn. 8, *ante.*) It further found in effect that appellants' pumpoff and discharge of water amounted to an *unreasonable use* thereof, because it operated "to the general detriment of the water basin and the restorative program of the . . . district." (See finding No. XIV, *ibid.*) As these findings are supported by substantial evidence, it follows that the district, as trustee for all surface owners within the basin (see fn. 5, *ante*), was entitled to the injunctive relief ordered. (*Katz* v. *Walkinshaw, supra,* 141 Cal. 116.)

The trial court was also correct in using the word "servitude" to connote the obligation imposed by the doctrine upon appellants, as landowners in the basin, to refrain from discharging more than their reasonable share of the underground water therein; the term ("servitude") is commonly used with reference to such obligations when imposed by law, and limiting the use of lands lying in a particular geographical area, where an overriding public interest requires it. (See, e.g., *Colberg, Inc.* v. *State of California ex rel. Dept. Pub. Wks.* (1967) 67 Cal.2d 408, 420 [62 Cal.Rptr. 401, 432 P.2d 3] [speaking to the servitude with which "the law of California burdens property riparian or littoral to navigable waters"].) The court also

---

[11]"The owner of the soil owns to the lowest depths." (Ballentine's Law Dict. (3d ed. 1969) p. 295.) The substance of the two-directional maxim which encompasses this one ("Cujus est solum, ejus est usque ad coelum et ad inferos" ["The owner of the soil owns to the heavens and also to the lowest depths": *ibid.*]) is enacted in Civil Code section 829, upon which appellants rely with respect to their subterranean use of their *land*. (See text at fn. 9, *ante.*)

properly denominated the "servitude" as "public," because the right to enforce it is held by a public agency (respondent district) as trustee for all surface owners and suppliers of water (i.e., the "public") in the Niles Basin. (See fn. 5, *ante*.)

In response to appellants' explicit basis for challenging the judgment, we also point out that the court did not, as they put it, "create a new property interest" in respondent district. In its pertinent conclusions of law (quoted *supra*), the court merely declared the *existence* of the "public servitude" in the Niles Basin and fixed its level. The "servitude" having been declared by application of the correlative rights doctrine, which originated in 1903 (*Katz* v. *Walkinshaw, supra,* 141 Cal. 116), it has applied to surface owners in the basin (as throughout California) ever since, and has accompanied any devolution of title by which appellants hold the property in question.

### Appellants Were Properly Denied Inverse Condemnation Relief Because There Was No "Taking" or "Damaging" of Their Property

The trial court having correctly applied the correlative rights doctrine as discussed above, appellants are not entitled to relief in inverse condemnation for two reasons. In the first place, the judgment enjoins them from pumping underground water from their pits without the consent of respondent district or "the further order of . . . [the trial] . . . court." The second provision assures them of judicial protection against arbitrary or unreasonable action by the district in withholding consent. The effect of the first one is to decree that the correlative rights doctrine compels the restriction of appellants' pumping operations to the extent required by the district's discharge of its public (and undisputed) duty to prevent waste of underground water in the Niles Basin. The first provision therefore amounts to no more than a judicial imposition of the restraint which was already imposed upon appellants as an explicit condition of the revocable use permit which controlled the use of their land. (See fn. 3, *ante*.) As they have lost no rights which they had in fact, there has been no actual "taking" or "damaging" of their property which is compensable under article I, section 14. (See fn. 1, *ante*; compare *Rose* v. *State of California, supra,* 19 Cal.2d 713, 728-729.)

### Appellants Were Properly Denied Inverse Condemnation Relief Upon The Theory of Respondent District's Police Powers

The second reason that appellants are to be denied inverse condemnation relief presupposes that their property rights have at least been "damaged" (see Cal. Const., art. I, § 14 [fn. 1, *ante*]) by the imposition of the correlative rights doctrine upon their land and their rights as surface owners. If this

has occurred, we agree with respondent district's argument that the event is not constitutionally compensable because it is the result of the district's exercise of its police powers. (The argument is presented in the alternative; in the discussion which follows, we adopt it as an alternative ground of decision.)[12]

Article XIV, section 3 of the California Constitution expressly states: "It is hereby declared that because of the conditions prevailing in this State the general welfare requires that the water resources of the State be put to beneficial use to the fullest extent of which they are capable, and that the waste or unreasonable use or unreasonable method of use of water be prevented, and that the conservation of such waters is to be exercised with a view to the reasonable and beneficial use thereof in the interest of the people and for the public welfare. . . . This section shall be self-executing, and the Legislature may also enact laws in the furtherance of the policy in this section contained."

After this provision had been adopted in 1928, the Supreme Court squarely held that it expressed a legitimate exercise of the police power of the state. (*Gin S. Chow* v. *City of Santa Barbara* (1933) 217 Cal. 673, 701 [22 P.2d 5].) Distinguishing its effect from that of article I, section 14, the *Gin S. Chow* court stated: "There is a well recognized and established distinction between a 'taking' or 'damaging' for public use [as contemplated in article I, section 14] and the regulation of the use and enjoyment of a property right for the public benefit. The former falls within the realm of eminent domain, and the latter within the sphere of the police power. That the constitutional amendment . . . [art. XIV, § 3] . . . is a legitimate exercise of the police power of the state cannot be questioned. It is the highest and most solemn expression of the people of the state in behalf of the general welfare. The present and future well-being and prosperity of the state depend upon the conservation of its life-giving waters." (*Id.* at p. 701.)

The police power thus endorsed by the Constitution applies " 'to all water rights enjoyed or asserted in this state, whether the same be grounded on

---

[12]Appellants pointed out at oral argument that the trial court had not viewed the situation as permitting invocation of the police-powers theory. Their observation is correct: the theory is not expressed in the court's findings or conclusions (quoted *supra*), and the trial judge apparently disavowed it in his "Memorandum Decision." (See fn. 10, *ante.*) However, the judge's view is not binding on appeal: accepting respondent district's argument based upon its police powers, we may cite it in support of the judgment under the familiar rule that we may affirm the latter, upon any valid ground appearing, even if we disagree with the trial court's reasons for arriving at it. (6 Witkin, Cal. Procedure [*op. cit. supra*] Appeal, § 226, pp. 4215-4216.)

the riparian right *or the right,* analogous to the riparian right, *of the overlying land owner, or the percolating water right,* or the appropriative right.' (Citation.)" (*Joslin* v. *Marin Mun. Water Dist.* (1967) 67 Cal.2d 132, 138 [60 Cal.Rptr. 377, 429 P.2d 889] [italics added].) On innumerable occasions, the Legislature has implemented the constitutional mandate by enacting statutes which stress the equation of the state's water resources with the public "health, safety and welfare"; such statutes have been directly addressed to ground water basins (see, e.g., Wat. Code, § 12922.1), and are included within the special enabling law under which respondent district carries on its water replenishment program. (See Stats. 1961, ch. 1942, § 22, p. 4103.)

The evidence received at the trial hereof, as summarized *supra,* fully demonstrates that the activities of the district have been carried on in the exercise of its police powers. Accordingly, the effect thereof upon appellants' property is not compensable under article I, section 14 of the Constitution. (*Gin S. Chow* v. *City of Santa Barbara, supra,* 217 Cal. 673 at pp. 700-703, 705. See *Colberg, Inc.* v. *State of California* ex rel. *Dept. Pub. Wks., supra,* 67 Cal.2d 408 at p. 420.)

The disposition hereinafter ordered reaches the subject matter of all three notices of appeal filed herein.

The order entered on January 7, 1972, and the judgment entered on March 7, 1972, are affirmed.

Christian, J., and Devine, J.,* concurred.

A petition for a rehearing was denied April 9, 1974, and appellants' petition for a hearing by the Supreme Court was denied May 8, 1974.

---

*Retired Presiding Justice of the Court of Appeal sitting under assignment by the Chairman of the Judicial Council.