[No. B077802. Second Dist., Div. Six. Dec. 20, 1994.]

LOS OSOS VALLEY ASSOCIATES, Plaintiff and Respondent, v. CITY OF SAN LUIS OBISPO, Defendant and Appellant.

## COUNSEL

Andre, Morris & Buttery, Dennis D. Law and Kathlene Bonnigson for Plaintiff and Respondent.

Hatch & Parent, Thomas D. Wise and Scott S. Slater for Defendant and Appellant.

## OPINION

**GILBERT, J.**—During a drought condition, a city supplies its citizens with water it draws from the ground. The groundwater pumping causes subsidence resulting in damage to buildings.

Here we hold the city is liable in inverse condemnation to the owner of the buildings.

We affirm the judgment of the trial court that appellant, the City of San Luis Obispo (the City), is liable in inverse condemnation for physical damage to the buildings of respondent, Los Osos Valley Associates (LOVA).

### FACTS

In 1985, the City implemented an annual water plan because the amount of water the citizens used each year had reached the "safe annual yield"—the normal supply of water equaled the demand. The former utilities director for the City, William T. Hetlund, explained that the City viewed this as a ". . . critical point of water supply." The City wanted to ensure that it did not run out of water.

Hetlund explained that the plan was created ". . . to manage what water we had better" and "to maximize use of the reservoirs and be able to project further into the future the impact." This plan was "based on a six-year dry cycle that occurred back in the late 1940's, early 1950's." As of 1985, the City ". . . knew we had a fixed amount of water that would last us through six years. . . ."

When water level supplies got lower, the City planned to either locate new sources of water or carry out stricter levels of water conservation. The object was to avoid reaching a critical point where options would be limited.

As of December 1986, annual reports predicted that water supplies would reach a critical level by the middle of 1989. A critical level was deemed to mean having one year's supply of drinking water available. The plan was monitored on a weekly basis and became increasingly sophisticated with the use of computer models.

The City became more concerned in 1987 about decreasing supplies of water. The City's water element of its land-use plan called for conservation of water as its first priority; the second priority was to use wells for irrigation of public property such as golf courses, parks and schools.

The City began to study the possible use of groundwater, drilling wells, cloud seeding, damming smaller streams, spillways, state water, desalinization, towing icebergs, and tankering water. The City had planned to develop and use wells since 1985. Instead, the City chose to exceed the safe annual yield in 1987 and to draw down the surface water supply without conservation measures.

In 1987, the City ". . . felt ground water was the best solution, because we thought it would be the quickest." Hetlund explained, "That [groundwater], and I think, a strong water conservation program were two areas we were relying on most heavily to help us through this dry cycle." Through 1988, only voluntary conservation was in effect in the City.

In April 1989, the City proposed and passed a mandatory conservation ordinance as a local urgency measure because of the ". . . clear and significant need . . . ." About this time the City realized it was "in a critical situation." Although the City kept considering stringent application of the conservation measure it had passed, and to raise water rates to obtain funds to finance needed water projects, the City did not find it necessary to restrict water usage to a 50 percent level, the highest level of conservation mandated by its ordinance. The highest level of mandatory conservation required by

the City during the pertinent period was 20 percent of the usage prior to conservation.

The City obtained exemptions from the requirements of the California Environmental Quality Act and was permitted to drill water wells and to extract groundwater. (Pub. Resources Code, §§ 21000 et seq., 21080 subd. (b)(4).) The City drilled wells which were ready for use in the fall of 1989. In the fall of 1990, the city council embarked on a program to develop a desalinization plant. Hetlund noted that "If we hadn't had ground water, that meant we would have made the desal decision earlier." The City never sought to proclaim an emergency pursuant to the Emergency Services Act, either. (Gov. Code, § 8550 et seq., and see § 8630.)

Hetlund explained that, "[w]ater has always been a very sensitive political issue with the City . . . ." The City ". . . balance[d] the economics and the technical issues with the political issues." The City's policy was "that we couldn't compete with ag[riculture]. . . ." "For political reasons, the council decided not to take the farmer's [agricultural] water. They decided to take extra water out of the [ground water] basin."

The City's groundwater program caused subsidence resulting in structural damage to LOVA's property, the Bear Valley Center shopping mall (Center). On October 11, 1991, LOVA filed the instant action for inverse condemnation. The City's amended answer included various affirmative defenses including immunity under its police powers due to the alleged emergency created by the drought. City asserted it should not be held liable for LOVA's damage.

The trial court ruled against the City on its affirmative defenses. After receiving special verdicts of the jury, the trial court entered judgment against the City. This appeal ensued.

## DISCUSSION

■ The City cites cases that elucidate the principal declared in article X, section 2 of the California Constitution. It states that controversies over water resources should depend on a factual analysis of competing reasonable, beneficial uses of water. The principle that the City wishes to advance, however, is not apropos to the instant case.

There is another constitutional provision that is applicable here. Article I, section 19, of the California Constitution states, in pertinent part, that "[p]rivate property may be taken or damaged for public use only when just compensation . . . has first been paid to . . . the owner."

The City contends that it need not compensate LOVA for the physical damage it caused because of the overriding principle contained in the provisions of article X, section 2, of the California Constitution.

Our Supreme Court has recognized that, "California's Constitution . . . its statutes . . . decisions . . . and commentators . . . all emphasize the need to make efficient use of California's limited water resources . . . ." (*National Audubon Society* v. *Superior Court* (1983) 33 Cal.3d 419, 446 [189 Cal.Rptr. 346, 658 P.2d 709].)

More specifically, article X, section 2, of the California Constitution states, "[i]t is hereby declared that because of the conditions prevailing in this State the general welfare requires that the water resources of the State be put to beneficial use to the fullest extent of which they are capable, and that the waste or unreasonable use . . . of water be prevented, and that the conservation of such waters is to be exercised with a view to the reasonable and beneficial use thereof in the interest of the people and for the public welfare."

The City argues that LOVA "unreasonably used" the water under its buildings to support them, and that the City had a superior right to its use because it faced an emergency. City cites *Joslin* v. *Marin Mun. Water Dist.* (1967) 67 Cal.2d 132 [60 Cal.Rptr. 377, 429 P.2d 889] in support of its proposition. It is inapposite. In *Joslin*, plaintiffs owned land riparian to a stream which carried and deposited rock, sand, and gravel onto their land which they sold in their business. Defendant district constructed a dam which completely obstructed the flow of these materials and plaintiffs sued.

The issue in *Joslin* was ". . . whether defendant, an upstream appropriator of water, is liable in damages to plaintiffs, downstream riparian owners . . . ." (*Joslin* v. *Marin Mun. Water Dist., supra,* 67 Cal.2d at p. 136.) *Joslin* applied the constitutional " '. . . doctrine of reasonable use between riparian owners and appropriators and between overlying owners and appropriators.' [Citations.]" (*Id.* at pp. 138-139.)

The Supreme Court held that plaintiffs' use of water was unreasonable in comparison with the conservation purposes of defendant, and that such unreasonable use was not subject to just compensation. (*Joslin* v. *Marin Mun. Water Dist., supra,* 67 Cal.2d at pp. 140-141, 143, 144; see also *Peabody* v. *City of Vallejo* (1935) 2 Cal.2d 351 [40 P.2d 486] [plaintiff riparian farmers have no reasonable, beneficial use of overflow floodwaters for depositing silt upon their lands entitling them to compensation for diversion of water by the city].)

■   The regulation of competing uses of water rests in comparing reasonable, beneficial uses. (*Peabody* v. *City of Vallejo, supra,* 2 Cal.2d at p. 383; see also *Town of Antioch* v. *Williams Irrigation Dist.* (1922) 188 Cal. 451 [205 P. 688].) In such cases, "[w]hat is a reasonable use . . . of water is a question of fact to be determined according to the circumstances in each particular case. [Citation.]" (*Joslin* v. *Marin Mun. Water Dist., supra,* 67 Cal.2d at p. 139; cf. *Hillside Water Co.* v. *Los Angeles* (1938) 10 Cal.2d 677, 688-689 [76 P.2d 681] [Plaintiffs sued the City of Los Angeles for injunctive and monetary relief for severely retarding crops by diverting water through underground pumping for use in the City. The Supreme Court held that the City could not be enjoined from pumping for the public use, but damages for inverse condemnation would lie.].)

■   The City also relies heavily on *Niles Sand & Gravel Co.* v. *Alameda County Water Dist.* (1974) 37 Cal.App.3d 924 [112 Cal.Rptr. 846], and *Gin S. Chow* v. *City of Santa Barbara* (1933) 217 Cal. 673 [22 P.2d 5]. Neither is apposite to the instant case. In *Niles,* the district conducted an underground water replenishment program to prevent salt water intrusion from the nearby San Francisco Bay. Because this program resulted in the flooding of plaintiffs' sand and gravel pits, plaintiffs pumped out and discharged the water into the bay causing substantial amounts of fresh water to be wasted, which could have been used for domestic use.

■   Under the "correlative rights doctrine," ". . . as between the owners of land overlying strata of percolating waters, the rights of each to the water are limited, in correlation with those of others, to his 'reasonable use' thereof when the water is insufficient to meet the needs of all. [Citations.]" (*Niles Sand & Gravel Co.* v. *Alameda County Water Dist., supra,* 37 Cal.App.3d at p. 934.)

In *Niles,* the district had a long-existent "public servitude" in the basin involved and plaintiffs had a correlative revocable use permit. Because the plaintiffs ". . . lost no rights which they had in fact . . ." and because the district properly exercised its police powers for its regulation of the use of this water, plaintiffs were not entitled to damages. (*Niles Sand & Gravel Co.* v. *Alameda County Water Dist., supra,* 37 Cal.App.3d at pp. 935-937, citing *Joslin* v. *Marin Mun. Water Dist., supra,* 67 Cal.2d at p. 132; and *Gin S. Chow* v. *City of Santa Barbara, supra,* 217 Cal. at p. 673.)

In *Gin S. Chow* v. *City of Santa Barbara, supra,* 217 Cal. at page 673, the City of Santa Barbara built a dam to divert water for domestic use, and authorized a neighboring district to construct another dam. Plaintiffs, riparian landowners, sued for injunctive relief to obtain entitlement to water

being diverted by defendants. No waters captured by defendants, however, could percolate into plaintiffs' riparian holdings. The water taken by defendants constituted ". . . extraordinary storm waters of the river . . . ." (*Id.* at p. 683.)

The *Chow* court held that defendants were entitled to take the excess flood waters from plaintiffs ". . . where no use is made of such waters on the riparian land and no benefit accrues to riparian land from their passage over the bed of the stream, and no damage is caused to the riparian land from the proposed diversion." (*Gin S. Chow* v. *City of Santa Barbara, supra,* 217 Cal. at pp. 684-685, 691-692, 694, citing *Gallatin* v. *Corning Irr. Co.* (1912) 163 Cal. 405 [126 P. 864].)

█ Cases concerning competing uses of water are different than those that deal with damage to property. Generally, a public entity must compensate landowners for the physical damage it causes to private property. In *Albers* v. *County of Los Angeles* (1965) 62 Cal.2d 250 [42 Cal.Rptr. 89, 398 P.2d 129], the county deposited 175,000 cubic yards of dirt, triggering a slide in an area believed to be quiescent and causing damage to various plaintiffs. Our Supreme Court held that when " '. . . there has been some physical disturbance of a right . . . which the owner of a parcel of land enjoys in connection with his property[,] . . . [a]ny definite physical injury to land or an invasion of it cognizable to the senses, depreciating its market value, is a damage in the constitutional sense . . . .' [Citation.]" (*Id.* at p. 260.) A property owner may recover in inverse condemnation for actual physical damage proximately caused to his property by a public improvement deliberately planned and built, whether such damage is foreseeable or not. (*Id.* at pp. 263-264.)

In *Tyler* v. *Tehama County* (1895) 109 Cal. 618, 626 [42 P. 240], the abutments to a bridge built by the county caused the creek to cut away the bank and by accretion had begun to destroy plaintiff's house and land. The court held that these facts stated a cause of action for a taking. (*Albers* v. *County of Los Angeles, supra,* 62 Cal.2d at p. 257.)

In *Holtz* v. *Superior Court* (1970) 3 Cal.3d 296, 299, 302 [90 Cal.Rptr. 345, 475 P.2d 441], plaintiffs successfully sued the Bay Area Rapid Transit (BART) system and the City and County of San Francisco in inverse condemnation for physical damage to their land and buildings which was caused by excavation for the BART system.

In *Smith* v. *County of Los Angeles* (1989) 214 Cal.App.3d 266 [262 Cal.Rptr. 754], several hillside homes were destroyed due to a landslide

caused by county's removal of debris alongside roads it had built, and by a waterworks district's discharge of water into the hillside. These activities removed lateral and subjacent support from the homes which resulted in their destruction. Plaintiff homeowners successfully sued the public entities and the Court of Appeal affirmed, inter alia, on a cause of action for inverse condemnation.

■ Here, the City similarly damaged LOVA's buildings by removing subjacent support. That it did so by appropriating groundwater is immaterial. The City's action constitutes a physical taking of property for which compensation is required. The rule, as it pertains to subterranean water, is stated in the Restatement Second of Torts section 818: "One who is privileged to withdraw subterranean water, oil, minerals or other substances from under the land of another is not for that reason privileged to cause a subsidence of the other's land by the withdrawal."

■ The only exceptions to compensation for physical takings are for damages inflicted pursuant to the proper exercise of the emergency police power, and where the state at common law had the absolute right to inflict damage. (See *Holtz* v. *Superior Court, supra,* 3 Cal.3d at pp. 304-305; and see *Locklin* v. *City of Lafayette* (1994) 7 Cal.4th 327, 365-366 [27 Cal.Rptr.2d 613, 867 P.2d 724] [discussing the conditional privilege for drainage of surface waters through improvements to a natural watercourse].) Otherwise, the government is strictly liable for compensating private property owners, such as LOVA, for causing such damage. (*Holtz, supra,* 3 Cal.3d at pp. 309-311.) Neither exception applies here.

The emergency exception is limited. It operates to avert impending peril. The *Smith* court, quoting *Holtz,* explained that " '. . . the courts have narrowly circumscribed the types of emergency that will exempt the public entity from liability.' " (*Smith* v. *County of Los Angeles, supra,* 214 Cal.App.3d at p. 286, fn. omitted; *Holtz* v. *Superior Court, supra,* 3 Cal.3d 296, 305.)

" ' "Instances of this character are the demolition of all or parts of buildings to prevent the spread of conflagration, or the destruction of diseased animals, or rotten fruit, or infected trees where life or health is jeopardized." [Citations.]' " (*Smith* v. *County of Los Angeles, supra,* 214 Cal.App.3d at p. 286; *House* v. *L.A. County Flood Control Dist.* (1944) 25 Cal.2d 384 [153 P.2d 950]; accord, *Holtz* v. *Superior Court, supra,* 3 Cal.3d 296, 305, fn. 10; cf. *Farmers Ins. Exchange* v. *State of California* (1985) 175 Cal.App.3d 494, 500-501 [221 Cal.Rptr. 225], and *Teresi* v. *State of California* (1986) 180 Cal.App.3d 239, 243 [225 Cal.Rptr. 517] [concerning widespread aerial

spraying to eradicate the Mediterranean fruit fly pursuant to a declaration of emergency under the Emergency Services Act, Gov. Code, § 8625 et. seq.]; *Rose* v. *State of California* (1942) 19 Cal.2d 713, 730 [123 P.2d 505] [Court of Appeal reversed grant of summary judgment due to question of fact whether "true emergency" existed when city waited 57 days after Coalinga earthquake to demolish an allegedly unsafe building].) In *Smith* v. *County of Los Angeles, supra,* 214 Cal.App.3d 266, the Court of Appeal held that county's decision to remove debris from roads rather than to close them constituted a choice, not an emergency.

■ The term "emergency" ". . . has long been accepted in California as an unforeseen situation calling for immediate action. [Citations.]" (*Sonoma County Organization etc. Employees* v. *County of Sonoma* (1991) 1 Cal.App.4th 267, 276 [1 Cal.Rptr.2d 850].) "Not only must urgency be present, the magnitude of the exigency must factor." (*Id.* at p. 277.) "Emergency is not synonymous with expediency, convenience, or best interests [citations], and it imports 'more . . . than merely a general public need.' [Citation.] Emergency comprehends a situation of 'grave character and serious moment.' [Citation.]" (*Ibid.*) It is "evidenced by an imminent and substantial threat to public health or safety. [Citations.]" (*Ibid.;* see generally, *Rutherford* v. *State of California* (1987) 188 Cal.App.3d 1267, 1280 [233 Cal.Rptr. 781] [no emergency where rainfall which caused problem fell over a year before construction work at issue commenced].)

■ In *House* v. *L.A. County Flood Control Dist., supra,* 25 Cal.2d 384, 388-389, our Supreme Court held that ". . . the exercise of the police power . . . cannot extend beyond the necessities of the case and be made a cloak to destroy constitutional rights as to the inviolateness of private property." (*Smith* v. *County of Los Angeles, supra,* 214 Cal.App.3d at pp. 286-287; also see *Rose* v. *City of Coalinga* (1987) 190 Cal.App.3d 1627 [236 Cal.Rptr. 124].) So it is here.

In the instant case, the City was well aware of the need to conserve water for years. It chose a combination of mild conservation measures and the damaging groundwater pumping. This choice of action over the years does not constitute an emergency. It constituted a choice among many that the City made over a considerable period of time. As such, the City may not rely on its police powers to avoid compensation for the physical destruction of LOVA's buildings due to its groundwater pumping operations.

The City never declared an emergency under the Emergency Services Act, nor did it require more stringent conservation measures of its citizens. The notice of exemption from CEQA obtained by the City to drill water wells

does not justify the damage under CEQA's definition of an emergency. ■ An emergency under CEQA also is ". . . a sudden, unexpected occurrence, involving a clear and imminent danger, demanding immediate action to prevent or mitigate loss of, or damage to, life, health, property, or essential public services. 'Emergency' includes such occurrences as fire, flood, earthquake, or other soil or geologic movements, as well as such occurrences as riot, accident or sabotage." (Pub. Resources Code, § 21060.3.) The exception for action under CEQA for emergencies ". . . is . . . extremely narrow." (*Western Mun. Water Dist.* v. *Superior Court* (1986) 187 Cal.App.3d 1104, 1111 [232 Cal.Rptr. 359].) "We particularly note that the definition limits an emergency to an '*occurrence*,' not a condition, and that the occurrence must involve a 'clear and imminent danger, demanding immediate action.' " (*Ibid.*, some italics omitted.)

■ Although courts generally defer to legislative determinations, ". . . the mere declaration of the [City] council . . . that the ordinance is passed for the immediate preservation of the public health is neither conclusive nor yet sufficient.' [Citations.]" (*Crown Motors* v. *City of Redding* (1991) 232 Cal.App.3d 173, 179 [283 Cal.Rptr. 356].) Here, the trial court found that no emergency existed; it found that the City made a political choice over time. We agree.

*Refusal to Instruct on Superseding Cause.*

■ The City asserts that LOVA's geotechnical engineer had actual notice prior to construction of the buildings in question that the soil was unstable and susceptible to settlement. The City requested an instruction and a special verdict question on whether LOVA's engineer's negligence was a superseding cause relieving the City of liability in this case.

The City argues the trial court erred in refusing to give its requested instruction. In fact, the City withdrew the jury instruction in question and it agreed to the standard superseding cause instruction the court gave.

That instruction states that, "If you find there was any negligence on the part of Plaintiff or Buena Engineers, you must determine whether the City's withdrawal of groundwater was a 'superseding cause' of the damage to Bear Valley Center. A 'superseding cause' exists where, subsequent to a negligent act, an independent non-concurring act operates to solely produce an injury. The subsequent act breaks the chain of causation.

"Whether the City's withdrawal of groundwater is a superseding cause is determined under the test of foreseeability. If the risk of injury might have

been reasonably foreseen by Plaintiff or Buena, Plaintiff is responsible. However, if the action of the City was highly unusual or extraordinary, not reasonably likely to happen, or the risk of harm was not forseeable, it is a *superseding cause*, and the negligence of Plaintiff or Buena, if any, does not reduce any recovery." (Italics in original.) This is a correct statement of the law of superseding cause. (See 6 Witkin, Summary of Cal. Law (9th ed. 1988) Torts, § 975, p. 366.)

The City alleged that LOVA and Buena were negligent when the shopping center was constructed, in 1987. The City did not initiate its groundwater pumping operation until over 18 months later. The damage it caused occurred during the summer of 1990. Accordingly, the alleged negligence of LOVA or Buena for the design of the buildings' foundations prior to the acts of the City could not have been a superseding cause of the damage LOVA incurred.

*Valuation Date.*

The City argues that the trial court erred in instructing the jury to use August 1990 as the valuation date. The trial court did not err. "[W]hen the taking occurs by physical invasion rather than by formal condemnation, the established rule is that the time of taking is the time of the invasion, and it is that event which gives rise to the claim for compensation and fixes the date of valuation. [Citation.] However, recognizing the hardship which may befall a property owner if such an early date is used where the property value has increased over time, our high court has concluded that the property owner should be permitted to enjoy the resulting increase in value if no fault is shown in failing to pursue available remedies promptly. [Citations.]" (*Leaf v. City of San Mateo* (1984) 150 Cal.App.3d 1184, 1191 [198 Cal.Rptr. 447], italics omitted.)

The judgment is affirmed. Costs to respondent.

Stone (S. J.), P. J., and Yegan, J., concurred.

A petition for a rehearing was denied January 17, 1995, and appellant's petition for review by the Supreme Court was denied March 23, 1995.